The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Good morning. We have two cases scheduled for argument this morning, both between the same parties. One is, the first is case number 20-1673. It's an appeal from the Patent Trial and Appeal Board. Mr. Kelly, are you prepared to argue? Yes, Judge O'Malley, I am. You may proceed. May it please the Court, good morning, Your Honors. The Board committed two fundamental errors in this case. First, it erred when it concluded that evidence of unexpected comparable efficacy between 480 mg and 720 mg of DMF to treat MS demonstrated non-obviousness in the face of Mylan's evidence. The Board also erred when it failed to grapple with a critical issue relevant to all the grounds before it, whether a skilled artisan would have learned information about DMF dosing from Shimmert 2004, a study teaching an MS treatment method using Fumiderm, a composition including DMF, as its main constituent. Now, starting with the first issue, the obviousness issue, Biogen has not contested our reading of the law. They do not dispute that in order to overcome a prima facie showing of obviousness, their secondary considerations, and particularly unexpected results, have to demonstrate a superior result, a result that's different in kind when compared to the closest prior art. Did you actually make that argument to the Board? Your Honor, we did not, nor did they. Both parties, Biogen and Mylan, marched down the same path. What Biogen said to the Board, and they said it like bookends around their discussion of secondary consideration, is that their quote-unquote evidence of secondary consideration demonstrates the non-obviousness of their invention. They did not specifically say that the unexpected results alone demonstrates non-obviousness, nor did they say that with respect to commercial success, long-felt and unmet need, or praise by others. They never really said that only if you have all of them. I mean, they basically said that they all demonstrated non-obviousness. So how can you say they have to show all of them in order for them to establish non-obviousness? Your Honor, they talked about their strong evidence of secondary considerations collectively. They did not talk about their individual secondary considerations like they had done in a previous IPR brought by the Coalition. They just didn't say that. And so they approached it the way they did, which is to say there's four pieces of secondary considerations, there's four pieces of evidence, they're going to put it up on the scales, and then once it's up there, the scales are going to tilt. And so we responded in kind. We said that they hadn't proven each of the four. It was an evidentiary challenge. But in saying you hadn't proven each of the four, one of the four is unexpected result. So I guess I don't understand how you can say that you didn't have an obligation to raise this difference in degree and difference in kind in front of the Board without having forfeited it. Well, Your Honor, first of all, this Court has been clear that when the Board passes on an issue, it is not forfeited, and that's what happened in this case. The Board actually decided this, and so we're entitled to appeal it. And we're not asking this Court to consider evidence that's outside of the record, as was asked in redline detection, which Biogen cites in its brief, nor are we asking this Court to consider something that wasn't passed on below, which is what happened in Singleton, the other case they cite in their brief. We're just asking the Court to review the actual decision the Board made. And it's true that if we had failed to rebut each one of their four secondary considerations and the Board waived them all collectively, we would have a hard time standing here arguing that the four collectively cannot overcome our obviousness case, even if proven. That would have been waived. But the Board didn't walk down the path either party laid out. The Board stepped off the path, and we think it did for pretty clear reasons, which is that our showing on all of the other secondary considerations was very, very strong on unexpected results. What's the legal authority that you cite to support the position that you're making right now? Your Honor, that when something is actually raised by the Board, that we can appeal it, I think that would be Lifestyle Enterprises. We have that in our brief. And as for whether or not their showing of comparable efficacy is enough to overcome a prima facie showing, that's very well spelled out in this Court's law. In fact, the Galderma case that we cite in our brief is remarkably close to this case. It's a situation where the evidence was that someone of skill in the art would have thought that 1% treatment of the topical solution was the optimal treatment method for treating acne, that 3% would have increased side effect. It sounds to me like you're arguing a degree in difference, that at some point the difference in degree is insufficient. Well, Judge Rayner, two things. We are arguing that, but the difference in degree is subsidiary to the superior result. So, first of all, you have to have a superior result, which they haven't shown. But even if you had a superior result, that superiority would have to be a difference in kind and not degree. So they have two problems. Their first problem is that they haven't shown superiority at all. But I think you're over-reading these difference in kind and not degree cases, and you actually don't spend a lot of time on any of them in your brief. And I think it's because they all go back to In re Aller, and In re Aller only talked about that being the case where the result is different in kind from something that one of skill in the art at the time would have clearly understood. Your Honor, that is relevant to simply a difference in degree, but you also have to show some amount of superiority, which they haven't shown. So even if their difference of degree is enough, and even if, you know, we cannot argue about the difference in degree in a factual situation like this because they would say, and I think this is implicit in Your Honor's question, that nothing was expected from 480 milligrams, and so anything would have been a difference in kind. Even if they could argue that, they're still stuck on the superiority issue. They're still stuck with the problem that no one would have expected. I'm sorry, let me say that differently. They're still stuck with the fact that they haven't shown any superiority. And I think it's important to... Are you saying that a lower dosage, that there's no benefit to a lower dosage? I'm saying, Your Honor, that that certainly wasn't proven or argued in this case, that 480 milligrams had any benefit whatsoever. They have pointed to a statement made by their prosecution counsel, but that statement was not an unexpected result of 480 milligrams. That statement was that 480 milligrams would have been expected, and that's the word their counsel used, expected to have lower side effects. So an expected result is not an unexpected result. It can prove non-obviousness. They're arguing what was unexpected is that it was clinically equivalent to the 720 milligram dosage in terms of its benefits, right? Well, what the board found is comparable efficacy. Right. Yes. And that is the only benefit the board found. There's nothing in the board's opinion, nor should there have been, because there's nothing in any of Biogen's argument, that 480 milligrams was better than 720 for any reason related to side effects. In fact, their experts at trial said the opposite. Their experts said, once GILDNR would not have understood there to be a dose-dependent side effect profile. They actually argued that it would have been obvious to go higher than 720, not lower. But, again, they're stuck with only comparable efficacy, and if you consider the role of unexpected results and really all secondary considerations in obviousness, it's clear why you need a superior result. Secondary considerations are a check on the initial obviousness. So what marks whether you have a superior result or not? Is that just a factual determination that's made? Is there some sliding scale or degree that must be consulted? Well, certainly it's a question of fact, and I do think it's fair to say there could be some sort of sliding scale. I mean, there are cases like the Rexo case that they cited, where there was a 66% increase in bioavailability. That was a case where that amount of increase was significant because bioavailability was the key problem with the drug in the first place. So, yes, I think it's fair to compare what the unexpected result is in the context of the whole invention, and in that sense I suppose there's a sliding scale. But what it gives us, Your Honor, is it gives us some sort of showing that our initial prima facie obviousness case was flawed. If it truly was obvious to do something, and doing it achieved commercial success, solved a long-felt and unmet need, garnered industry praise, or produced unexpected results. If doing it actually did that, then that shows it wasn't obvious in the first place. But here they haven't proven that. What they've proven is that a lower dose has comparable efficacy to the known 720-milligram dose. That is as much as they've proven, and that is not enough to overcome a showing that would have been obvious to optimize dosing in the face of evidence that showed 720 milligrams as a successful treatment method for MS, and respectfully to the Board, 360 milligrams. And that second point is related to the second point we raised in this case about the Shimrick reference. The Board had an obligation to show its work. It had an obligation to wrestle with the issue that the parties were disputing. And in the second ground that we've raised here on appeal, the issue with the Shimrick reference, the Board clearly didn't do that. You know, Biogen says that... But wait, didn't the Board make a factual finding that the results of Shimrick could not be extrapolated to how DMF would work as a monotherapy? The Board said that, Your Honor, but the Board said that because of repeated statements by the Board that there was more than DMF in Fumiderm. And this is clear at pages 17 and 18 of the Board's decision. Right, and why is there not substantial evidence to support that factual finding? Because, Your Honor, that wasn't the dispute between the parties. We were not disputing the presence of additional constituents in Fumiderm. There's no debate that DMF is in Fumiderm along with other components. So when the Board reached its finding that Fumiderm does not teach anything about a DMF monotherapy, it was essentially ignoring the debate between the parties. And the debate was what one skill in the art would have gleaned from Fumiderm. But haven't we said repeatedly that the Board, once the evidence is before it, the Board is free to consider it regardless of how the parties fashion their arguments? Sure, Your Honor. They're free to consider it however they want, but they have to, under the APA, they have to lay out a roadmap to facilitate this court's review and in our appeal. You know, Biogen has challenged us for not making a substantial evidence appeal here, but we can't because we don't know what the Board did. We don't even know that the Board understood the issue. We had evidence, and Biogen pointed to the same evidence, that skilled artisans were actively studying Fumiderm. They were actively studying the role of DMF. We had evidence that DMF proved no worse than Fumiderm. We had evidence that DMF was the only constituent in Fumiderm that breaks down into MMF, monomethyl fumarate, once it's ingested, and that is the active component. And they fought us on that evidence. They didn't just walk into the Board and say, nope, there's additional constituents, therefore we win. They produced declarations. They explained why. Counsel, so then this argument comes down to whether Fumiderm has multiple active ingredients and whether APOSA would have understood the teachings of Fumiderm because DMF is the most abundant active ingredient in that composition. That's what you're arguing. It's the most abundant active ingredient, correct? It's more than that, Your Honor. So that is correct, but it's much more than that. We're not arguing that a skilled artisan would simply read Shimrick and say, aha, that's the amount of DMF we should use. Our position is that Fumiderm and Shimrick's 2004 discussion of Fumiderm taught something to people skilled in the art. It taught something about DMF dosing. And in fact, Shimrick only referred to the DMF amount. It taught something, but it doesn't teach enough so that APOSA can draw conclusions about the efficacy of DMF monotherapy. And your argument is that the reason that APOSA can't draw those conclusions is because Fumiderm has multiple active ingredients. No, Your Honor, I think that's the other side's argument and it's part of it. Our argument is that someone skilled in the art would have looked deeper than simply the identification of Fumiderm. And what the board said, and I'm quoting now page 18 of the board's decision, quote, we find Shimrick 2004 does not teach or suggest anything about the effectiveness of any individual fumarate. They said it for two reasons. It wasn't just the fact that it had additional components. It also said that it described two different phases of doses, not two ranges of doses. Your Honor, that is not what the board said. I mean, the board said over and over again. If you look down on page 17, sentence after sentence, the board simply repeats the mantra that there is more than DMF and Fumiderm. That's the board's analysis in full. Okay. We'll save your time for rebuttal, Mr. Kelly. Thank you. Thank you, Your Honor. Mr. Lee? Thank you, Your Honor. May it please the Court. Can you address that last point first? I sure can, Your Honor. I was going to start with Shimrick because I think what Mr. Kelly has suggested to you is not an accurate summary of the support for the findings that the board cited in support of the proposition that Mr. Kelly is now challenging. What the board did at Appendix 18 was expressly acknowledge Mylan's argument that DMF is the most active ingredient, but then found that there were three other active ingredients that cumulatively totaled 44% of the composition. And found that multiple experts testified, and I'll quote the finding, the presence of multiple active agents in Fumiderm precludes extrapolation of Shimrick's 2004 results in any dose of DMF monotherapy. That is the key. It's DMF monotherapy that's claimed in the patent. And what the board was focused on is, does Shimrick describe or suggest a DMF monotherapy in any particular dose? And in A17, it expressly finds that it does not and articulates its findings. Do you agree with Mr. Kelly that you never actually made any of these arguments? No, Your Honor. These arguments were actually expressed findings that the board made as a result of the evidence that we offered to them. And in fact, when they made those, Your Honor, the board cited our expert, Dr. Duddy, who provided the detailed breakdown at our request about the percentages. They also cited his testimony about an independent study of Fumiderm, in that case for the treatment of psoriasis, where the authors cautioned that you can't make conclusions about any particular component when you have a mixture. The board also cited another of our experts, Your Honor, again offered by us, that says that Dr. Winn, who testified that the person of ordinary skill in the art could make no determinations about the relative contributions of any of the four active components. And the board even, Your Honor, cited Mylan's expert, Dr. Binet, at Appendix 18 to 19, where he said that any two drugs can have a synergistic effect and you need to figure out what it is. So I think that, at least as I understand the challenge on this fourth issue, and I thought there were four issues that were being raised, but I think it's now been collapsed into two. But on this Shemrick issue, the precise finding that Mylan is suggesting was not made was in fact made. The challenge, as I understand it, is an Administrative Procedure Act challenge that the board didn't articulate the reasons for the finding. But if you look at the finding itself and the portions of the record that are cited, you will find that there is, number one, ample support, certainly substantial evidence to support the finding. The specific citations are to, among other things, experts that we offered to the board and who offered expressed opinions on the consequences of having a composition of four different compounds rather than monotherapy of one and the reasons they couldn't draw any conclusions from that. And the last thing I would say in this, Your Honor, is this. I think it's not a coincidence that this is being offered to you as an Administrative Procedure Act challenge. In some sense, that's a way to avoid considering it in the traditional sense that simply is there substantial evidence, which there surely would be. The effort to characterize it as an APA challenge is an effort to take what is really a substantial evidence question and turn it into a legal question. But there is no legal question. There was the articulation of the finding. There was the articulation of the reason for the finding. There was the specification by the board of the testimony upon which it relied. And to answer your question, again, Your Honor, at the risk of being slightly redundant, it was... Was there an articulation of commercial success? Your Honor, there was. The board did not make an articulation of commercial success. So if I come back to... I'm sorry. The board did not? No, Your Honor. Your Honor, in its opinion, the board relied upon... Isn't that an APA issue then? It's not, Your Honor. So this would be what I would call the third issue that they cited in their brief and a different issue from SHMREC. But you're right, Judge Reina. This is their second or first, depending on how you're counting, APA issue. And the issue that they've characterized as an APA issue is the suggestion that when turning to secondary considerations, and under a psychobenzaprine, you don't turn to them, you actually incorporate them into the overall obviousness determination. Correct. When you turn to them, the claimed APA violation here is that you are somehow obligated to consider all of the secondary considerations that had been offered by the patentee. And that is incorrect both as a matter of law and a matter of fact. It's incorrect as a matter of law because, as the panel knows, if the absence of secondary considerations is not an indication that a claimed invention is obvious, the presence of secondary considerations is an indication that it's not obvious. Shouldn't the board at minimum say there's an absence of this secondary consideration and then move on? Can it just not address at all arguments that were actually raised? Your Honor, it can. And it can for this reason. If we're correct in our understanding of the law, which is that any one secondary consideration, when considered under Graham and psychobenzaprine, any one consideration can provide important information about whether an invention is obvious or not, there is no obligation to move to the other three. And that happens frequently in all of the district courts, the International Trade Commission, the different fora that provide appeals to the courts. The courts consider one of a group of asserted secondary considerations. Particularly in this case where it found one to be sufficiently superior and overwhelming to move back to the first issue, Mr. Lee, can I just interrupt you? I think you're moving back to unexpected results anyway. This is Judge Hughes. Your friend, Mr. Kelly, argues that for unexpected results, you need a superior result, not just a comparable result or a comparably better result. Do you agree with that as a matter of law? I think, Your Honor, what we agree to is, what we agree is that the articulation of the requirement by this court is you need unexpected results. Unexpected results can be characterized in many ways and has been in many opinions. In this particular case, what the board found was that the unexpected results of the 480 milligram per day dose was unexpected. And two things are critically important, Judge Hughes. Can I just stop you there so I understand your answer? That sounds like you're at least implicitly saying the 480 doesn't have to be better than the 720. It doesn't have to be superior to it. It just has to be unexpected for some reason. Is that right? That's exactly right. And, Your Honor, this is particularly important when you consider the fact that the arguments that Mylan made that led to the board's finding on this question of unexpected results are arguments that Mylan has abandoned now. They're not making any of the arguments they made before. What the board did in rejecting those arguments is find the following. It compared the post-filing Phase 3 results of the 480 milligram per day dose to the prior art, and that was the Phase 2. The board found that in Phase 2, the closest dose to the 480 was the 360 milligram per day dose, which was found to be not effective compared to placebo for treating MS, although the 720 milligram per day dose was. The board found in rejecting their arguments that a skilled artisan would have expected the efficacy of 480 milligrams per day to be closer to 360 milligrams per day. And then the board found, and this is the portion that goes to the issue that Mr. Kelly started with, it found that the 480 milligram per day dose demonstrated significantly and unexpectedly superior results. It was better than the closest dose in the prior art, the ineffective 360 milligram per day dose, but in addition, it was effective across all Phase 3 endpoints, which were a broader set of endpoints, clinical and radiological, than Phase 2, and the performance of the 480 milligram per day dose matched the significantly higher 720 milligram per day dose. That is what the board found to be unexpected, that a relatively small increase from an ineffective dose would produce such a strong result matching the performance of the much higher dose. Those findings are really not challenged, in part because Mylan has abandoned the arguments made below. Instead, they say two things to you that the questions from Judge O'Malley and Judge Reina touched on during Mr. Kelly's argument. The first is this question of the similarity between the 480 milligram per day dose and the 720 milligram per day dose in Phase 3. And candidly, I'm not quite sure I understand the argument because Phase 3 was not the prior art. We all agree upon that. Phase 2 was. The fact that the 480 milligram per day dose had the same effectiveness in Phase 3 as the 720 milligram per day dose actually proves our point. It proves our point that it was unexpected that the 480 would have that level of efficacy. What is your response to Mr. Kelly's argument that you had to show not only that it was unexpected that it would have that efficacy, but you had to prove that there was some benefit from the lower dose? Your Honor, I would say two things. The first is that the specific arguments that were made below did not include that argument. And those are arguments that have been forfeited. Mr. Kelly was candid and honest when he said, no, they didn't assert this argument below. The fact that unexpected results were considered below doesn't mean you can bring any unexpected results argument to this panel today. Otherwise, if I had an obviousness contention that I lost at the PTAB or in the district court or at the ITC, I could come to you with a different combination or a different articulation, the same combination, and that cannot be the result. The second thing, Your Honor, is that the board's findings that were made, rejecting the arguments that Mylan did make but now has abandoned, demonstrate that the small increase from 360 to 480, an increase over a dose that was known to be ineffective, produced a strong result, a strong clinical result, matching the performance of a much higher dose of 720 milligrams per day. That is what the board found to be an unexpected result. Judge O'Malley, as I think your question alluded to, if you look at the questions that consider the question of difference in kind and difference in degree, there's often a label that is appended after the court has looked at the specific facts of the specific case and determined whether there has been something unexpected of significance. And to go back to Judge Hughes' question, the standard that this court has articulated is, on those facts, is there something unexpected of significance? By that standard, the PTAB found that there, in fact, was. By any standard, the demonstrated results of the 480 milligram per day dose in Phase 3, matching those of the 720 milligrams per day dose in Phase 3, were unexpected. And the record evidence that the board relied upon demonstrated just that. That's the reason that Mylan has not pursued the arguments made below. It's the reason that there's not a substantial evidence to the board's findings rejecting those arguments. And that's the reason that there are two new arguments on unexpected results, one I would call the similarity argument and the other I would call the difference in kind or difference in degree argument, both of which are forfeited. Let me just say one final thing to go back to Judge Rania's question. Judge Rania, I don't think that the board would be obligated to consider all the secondary considerations if it found a particular secondary consideration to be so compelling that it did not need to reach the others. And I think that's, in fact, what occurred here. And it occurred on a record where the evidence that was offered on the secondary consideration, which was so compelling, unexpected results, was evidence that was provided separately by both parties. It was arguments made separately by both parties. And there was no contention at the PTAB by Biogen that somehow the four secondary considerations that we were offering collectively were required in order to demonstrate. But how does that allow this court, how does that give this court a basis to make an adequate review if the PTAB doesn't address all of the arguments made with respect to the objective criteria? Your Honor, it's a good question. I think, Judge Jamali, can I finish my answer to the question? Judge Rania, here's the reason. The reason is embedded in the legal principle that the absence of a secondary consideration cannot prove obviousness. It is only the presence of a secondary consideration that can help demonstrate non-obviousness. If that principle is correct, and I believe it is, then what that means is if you have a compelling secondary consideration, such as unexpected results, you need not reach the question of whether the other three, in this case, are present. Because even if you assumed the worst for the patentee, even if you assumed that they were absent, it would not have any legal significance, and I think that's the reason. Thank you, Your Honor. Okay, thank you, Mr. Lee. Mr. Kelly? Thank you, Judge Jamali. Just a few quick points. Mr. Lee, in discussing the unexpected results findings of the board, in order to make the argument he's making now, he has to boost up what the board actually said. The board made no findings about 360 milligrams. What he was pointing to on pages 38 to 39 of the board's decision is simply the board's recitation of their evidence, and that's not a finding by the board anymore than the board's recitation of our evidence is a finding. The board's finding about unexpected results is at the bottom of page 39, and what the board said is that it was persuaded that the weight of the evidence sufficiently established the comparable efficacy between 480 milligrams and 720 milligrams. Well, if that's what the board says, then why isn't it fair for us to consider the entirety of the evidence that the board recites? Because, Your Honor, the board then, as a legal matter, weighs its finding against that evidence. The board's finding was about 720 and 480. The board didn't make any other findings. The board is the finder of fact. But as a finder of fact, it said that the weight of the evidence, and it had just laid out all of what it considered that evidence to be. Right? Sure. Yes, Your Honor, and when the board does that, it's the fact finder. And so the board says, we looked at all the evidence, and here's our finding. It's that finding that this court can now rely on when reviewing de novo the board's weighing of the secondary consideration, the only one it reached, the board reached, against our prima facie case. That's what happened. You're arguing that there's a lack of analysis here, that the board recited the evidence but didn't undertake any analysis of it. So, Your Honor, that is our argument about – yes, Judge Rayna – about the second half of the case, about Shimerick. We're not saying the board did an insufficient analysis when it did the weighing. We're saying it weighed it incorrectly. That's – the comparable efficacy was not enough. Yes, it should have looked at everything else that Biogen raised if it was going to go down the path that Biogen let it down. But to the extent it did what it did, it did it wrong. Because 480 is merely comparable to 720. With respect to your point that the board should have addressed all four – or all of the secondary considerations, I guess I'm not really sure I understand that. I mean, as Mr. Lee said, this happens all the time. If the board says this one secondary consideration is strong enough that we don't need to even consider the others, that that's the end of the inquiry. I mean, if we were to say that any time secondary considerations are proffered, there must be a consideration of all of them, then I think we're changing the landscape of how courts and administrative bodies consider these issues. So, Your Honor, just to be clear, what we're saying is not that they have to do it every single time, but that if they're only going to consider one secondary piece of evidence, if they're going to shortcut their analysis, then we can appeal that one piece of analysis, and that gets reviewed de novo. And we're not suggesting that the court should send this back and say, PTAB, go consider the other three and then weigh it again. What we're asking this court to do is two things. One, to correct the board's mistake when it came to the legal analysis it did about the unexpected results, meaning that mere comparable efficacy could not overcome our case, and then remand for the board to consider the whole sum of the secondary considerations argued by Biogen. The last thing I'd like to say, just in the few seconds I have left, is that should this court affirm the district court's decision, it need not reach the issues raised in this appeal because the entirety of the dispute between Biogen and Mylan has been raised before the district court. There are no claims in this case that aren't in the district court. Thank you.